238 So.2d 142 (1970)
FLETCHER CO., a Florida Corporation, Appellant,
v.
MELROE MANUFACTURING CO., a Foreign Corporation, and West Florida Equipment Company, a Florida Corporation, Appellees.
No. M-27.
District Court of Appeal of Florida, First District.
July 30, 1970.
Rehearing Denied August 26, 1970.
Gregory, Towles & Beatty, Quincy, for appellant.
H. Franklin Perritt, Jr., of Marks, Gray, Yates, Conroy & Gibbs, Jacksonville, and Hall, Hartwell, Michaels & Hall, Tallahassee, for appellees.
*143 RAWLS, Judge.
This is an appeal by Fletcher Company, plaintiff below, from an order setting aside a jury verdict and granting both defendants a new trial. Appellant poses two justiciable points, viz.:
1. The trial court erred in setting aside the jury's verdict if the jury's verdict was based upon breach of implied warranty.
2. The trial court erred in setting aside the jury's verdict if the jury's verdict was based upon negligence.
As phrased, each of these points is directed toward evidentiary matters.
The salient facts are: Fletcher Company brought suit against Melroe Manufacturing Company, as manufacturer, and West Florida Equipment Company, as retailer, for damages arising out of a fire which destroyed Fletcher Company's fertilizer plant on March 22, 1965. The fire was allegedly caused by a Melroe Bobcat, a front-end loader, designed and advertised by Melroe for unloading fertilizer ingredients from boxcars. Fletcher Company, relying upon the advertising and a demonstration, bought the Bobcat from West Florida Equipment Company on December 14, 1964, about 3 months before the fire. While unloading a boxcar of cottonseed meal, the operator of the Bobcat heard a "whoosh" to his rear, turned to look and observed fire in the back of the Bobcat and in the meal around the left rear of the Bobcat where the flexible gas line was located. The fire destroyed the plant.
The learned trial judge's order, incorporating extensive findings of fact together with applicable principles of law, is dispositive of the issue, and we quote freely from same, viz.:
"Plaintiff operates a large business, a substantial part of which is a fertilizer mixing plant. In its business it utilizes trucks, mechanical loaders, and other machinery. It employs a full-time mechanic to make repairs and adjustments on this equipment.
"Plaintiff purchased from West Florida a Bobcat front-end loader[1] which had been manufactured by Melroe. Before purchasing the Bobcat plaintiff secured a demonstration of a similar machine at its plant and was assured by a representative of West Florida that the Bobcat would `do the job' needed by the plaintiff.
"[1] This is a piece of machinery similar to a small compact tractor with a large hydraulic shovel or scoop on its front end, the entire mechanism being propelled and operated by a gasoline engine. It is designed to operate in small areas.
"The Bobcat was used by plaintiff, being operated by various employees, for something over three months without incident other than requiring repairs in excess of those usually needed by new machinery. None of the repairs, which were for the most part made by West Florida, were directly related to the possible causes of the fire presently described.
"Along one side of plaintiff's fertilizer plant, but inside its walls there was a long concrete ramp constructed at a level conforming to the floor of a railroad boxcar on a parallel siding outside the plant. On the inside of this ramp was a series of large sunken bins extending some distance at right angles to the ramp.
"On March 22, 1965, the Bobcat was being used to unload a railroad boxcar of bulk cottonseed meal and depositing the meal in one of these bins. The Bobcat would cross a temporary gangway from the ramp to the boxcar, enter the boxcar, pick up a `scoop' of cottonseed meal, move to the bin and dump the meal into the bin. The scoop on the Bobcat would not reach to the back of the bin, so it was necessary that, as the front of the bin became full, *144 the Bobcat move out over and upon the meal already dumped in order to deposit meal in the portion of the bin farthest from the ramp.
"On the day stated the operator of the Bobcat was the only employee of plaintiff at work in the vicinity for several hours before the fire. He was not and had not been smoking and had no matches on his person.
"Under these conditions and at a time when the Bobcat was being operated on the cottonseed meal in the bin, the operator heard what he described as a `swoosh' and, looking over his left shoulder, saw the lower rear part of the Bobcat and the adjoining cottonseed meal in flames. He immediately sought help but was unable to prevent the almost complete destruction of the fertilizer plant, its contents, and the boxcar.
"Plaintiff charges defendants with liability for the resulting loss on two theories. In count 1 it charges a breach of an implied warranty in the following language: `* * * the defendants, jointly and severally impliedly warranted to plaintiff that this Bobcat was of merchantable quality and reasonably fit for its ordinary uses and purposes.'
"`That this Bobcat was not of merchantable quality and was not reasonably fit for its ordinary uses and purposes * * *.'[2]
"[2] The facts here involved took place before adoption of the uniform commercial code. Chapter 672, Florida Statutes [F.S.A.].
"It is abundantly clear from the evidence that Melroe advertised extensively that the Bobcat was adapted to use in close places and particularly in fertilizer plants.
It is also clear that West Florida knew of the nature of plaintiff's plant and the uses to which the Bobcat would be put by plaintiff at the time of the sale of the Bobcat to plaintiff.
"Under the common law the maxim caveat emptor was given a broad application to the detriment of the buying public. A modern trend in relating this rule is well described by the District Court of Appeal, Second District, in Wagner v. Mars, Inc., 166 So.2d 673:
"`Products liability law has undergone a rapid development in the past fifty years. This has been brought about in some states by statutory enactments, while in others the Courts have reached the same conclusion through logical extensions of common law principles. The Courts of this state, in keeping with our common law tradition, have pioneered this development, rather than leaving it for legislative action.
"`The process of developing the products liability law has been plagued by confusion in all jurisdictions, and, as the present case witnesses, there is still a measure of confusion in our state. The basic principles, however, are now well-settled.'
"Although the implied warranty of fitness accompanying a sale was originally confined almost exclusively to food in cases such as Blanton v. Cudahy Packing Co., [154 Fla. 872] 19 So.2d 313, and Cliett v. Lauderdale Biltmore Corporation, [Fla.] 39 So.2d 476, and bottled beverages in cases such as Florida Coca-Cola Bottling Co. v. Jordan, [Fla.] 62 So.2d 910, more recent decisions have extended it to mechanical devices. Matthews v. Lawnlite Co., [Fla.] 88 So.2d 299; Gates & Sons v. Brock, [Fla.App.] 199 So.2d 291.

* * * * * *
"The rule does not make a manufacturer the insurer of every person issuing his products. Examination of the cases in which the doctrine has been applied makes it clear that reasonable fitness is all that is required. *145 "In Wisner v. Goodyear Tire and Rubber Co., [Fla.App.] 167 So.2d 254, it is stated:
"`An implied warranty of fitness does not extend beyond the obligation to supply an article reasonably fit for the purposes intended, and does not impose a duty to furnish the best article of its kind or an article equal to any other similar or competing article.'
"Green v. American Tobacco Company, [Fla.] 154 So.2d 169, is probably the strongest ruling on record as against the manufacturer. But that case expressly declares:
"`If the defect is discoverable by simple observation then the law will imply no warranty against its existence.'
"The evidence should be examined with these principles in mind.
"There is no direct proof as to what started the fire. It is only reasonable to conclude that in some manner the fire originated from the Bobcat. But as to just how the fire came about the only evidence is that furnished by a Professor Frank Flannigan who examined the Bobcat on July 7, 107 days after the fire, and after the Bobcat had been removed from the scene of the fire. Professor Flannigan described in some detail the structure of the Bobcat giving particular emphasis to the fact that the gasoline tanks were located on the sides of the motor and were much much taller than they were wide and the feed line from the tanks to the fuel pump left the tanks several inches below the top of the tank so that some of the gasoline in the tank could escape by gravity from the tanks if the fuel line became ruptured. He also pointed out that the fuel line was flexible. He called it rubber but the evidence shows clearly it was not rubber and Professor Flannigan admitted he had made no detailed examination of the material from which it was made.
"From his examination of the remains of the carburetor Professor Flannigan reached the conclusion that the carburetor was not flooded with gasoline at the time the fire started.
"His opinion as to just how the fire originated is best stated in his own words:
"`Q And what is that opinion sir?
"`A It's my opinion that the fuel line, the flexible rubber fuel line ruptured and permitted gasoline to come out on the hot surface of the engine to vaporize and mix with the air in the engine compartment and form a combustible mixture, that this mixture was ignited by some source related to the exhaust system of the engine, and that it possibly could have been ignited  this is a secondary consideration  by ignition that was due to faulty wiring or an arc in the electrical system.
"`Q Primarily, sir, the source of heat would be from where in your opinion?
"`A From the engine itself, the combustion of the fuel in the cylinders which is routed out through the exhaust system and this is the prime source of ignition.

* * * * * *
"`Q In your opinion, sir, as a result of your examination of the Fletcher Company Bobcat, have you found any defects in its manufacture or design?
"`A Yes, sir.
"`Q Would you tell us what these are, sir?
"`A It's my opinion that the use of an unprotected rubber hose to carry the fuel from the gasoline tank to the fuel pump when used with a gravity feed system constitutes a defect in design. Failure to route this hose so that it was away from close proximity to moving parts and to bind it, restrain it, in such a manner so it couldn't get in touch with the rotating parts, would in my opinion, constitute an error in design; and the use of a gravity-type of fuel system which in the event of a break in this line would still permit fuel *146 to enter the hot engine compartment would constitute an error in design.

* * * * * *
"`Q Now as to the partial gravity fuel system, do you know that that system and that design is approved by the United States Army Engineers?
"`A I don't know it, but I'm not surprised.
"`Q Well, assuming that, would that make any difference in your opinion as to whether it is a good or bad design?
"`A No, sir, it would not. I still think that a gravity system that would permit inflammable fuel to hit a hot engine in case the hose breaks is dangerous.'
"It will be observed that although he expressed the opinion that `the rubber[3] fuel line ruptured' he never expressed any opinion as to what caused this rupture. He further expressed the opinion that gasoline flowed from the ruptured fuel line and became ignited from one of two sources  a spark from the exhaust system or an electric spark from the ignition system. He preferred the theory that the flame necessary to ignite the gasoline came from the exhaust system.
"[3] Professor Flannigan consistently referred to the fuel line as `rubber'. However, he admitted that he did not know and made no effort to find out the material of which it was made. The line actually on the Bobcat at the time of the fire was burned and he examined only a similar one furnished by defendants.
"It is significant to note here that Professor Flannigan testified that in experiments with another Bobcat he was unable to get gasoline to ignite merely by throwing it upon the engine even when the engine was heated by long running at high speed. When poured on the exhaust manifold, the hottest part of the hot engine, the gasoline merely vaporized instantly without catching fire.
"It is thus Professor Flannigan's opinion that in some way, from some cause, the fuel line ruptured releasing gasoline; that in some way, from some cause, the gasoline became ignited and caused the fire. He did give an opinion as to two causes which might have caused the gasoline to ignite but both of these are conclusions without any factual basis, other than an absence of other more likely causes.
"Assuming for the sake of argument that Professor Flannigan's theory (it is little more) as to how the fire originated has been established, that is: that the fuel line ruptured; that gasoline flowed from the ruptured line onto a hot motor; that the hot motor caused the gasoline to vaporize and that a spark eminating from the exhaust ignited the vapor and caused the fire, wherein is there a breach of an implied warranty of fitness of the Bobcat as a proximate cause of the fire?
"Plaintiff seeks to draw the conclusion of a breach of warranty from the testimony of Professor Flannigan that there were two `error(s) in design' of the Bobcat, and his statement on cross examination that `I still think that a gravity system that would permit inflammable fuel to hit a hot engine in case the hose breaks is dangerous.'
"This argument must fail for two reasons. First. There is no warranty against every possible defect in design of a mechanical device that hindsight may disclose. Few instrumentalities in common use could not be made safer or be so constructed as to minimize some risks. The warranty is that the machine is reasonably adapted to its intended use. The great weight of the evidence negatives the idea that the alleged defects in design rendered the Bobcat not reasonably adapted to its intended use. It is shown that a very high percentage of working-equipment using gasoline engines have all or partial gravity flow of gasoline from the tank to the engine. It is obvious that if the fuel line broke gasoline would escape. But this does not render the equipment not reasonably fit for use. Many factors must be considered in designing the shape and location of the gasoline tank on a moving machine such as *147 ease and safety in refueling, dangers of puncturing the tank by coming into contact with other objects, and proximity to the heat of the engine. The question is not whether the designer used the best possible judgment in constructing the Bobcat. It is whether or not the Bobcat was rendered not reasonably fit for use by reason of the design adopted.
"The parties all agree that a flexible fuel line is essential to prevent metal fatigue and breaking. Professor Flannigan refers to the line on the Bobcat as `fragile'. This opinion of Professor Flannigan is overcome by a sample fuel line which is in evidence without the necessity of resort to the testimony of other witnesses as to the strength of the material of which it is made. It is not a fragile tube.
"Professor Flannigan also expressed the opinion that there was an error in design in locating the fuel line. He says:
"`It's my opinion that the use of an unprotected rubber hose to carry the fuel from the gasoline tank to the fuel pump when used with a gravity feed system constitutes a defect in design. Failure to route this hose so that it was away from close proximity to moving parts and to bind it, restrain it, in such a manner so it couldn't get in touch with the rotating parts, would in my opinion, constitute an error in design; and the use of gravity-type of fuel system which in the event of a break in this line would still permit fuel to enter the hot engine compartment would constitute an error in design.'
"Again it is only necessary to comment that a defect in design which does not render a machine not reasonably fit for its intended use is not a breach of warranty. The testimony shows that the fuel line could have been forced into contact with some pulleys which were a part of the engine. There is no evidence whatever that the fuel line was of such design and location that it could be reasonably expected to come into contact with these moving parts or that it could make such contact without the application of outside force. More important, there is no evidence that it did come in contact with these moving parts. The material, location and design of the fuel line are all wholly immaterial to the case unless it is established by the evidence that they had some causal connection with the fire. Such evidence is wholly lacking. Professor Flannigan deducts that the fuel line `ruptured'. He expressed no opinion as to how or why this rupture occurred. There is no other evidence on this subject. If the rupture occurred as a result of some cause other than the design and location of the fuel line then if any defect in the line existed it was not the cause of the fire.
"Second. When a buyer examines the goods, or samples of the goods, before buying there is no implied warranty against defects which an examination ought to reveal. The alleged defects in the design of the Bobcat were obvious upon the most casual observation of the engine. The location of the fuel line takeoff from the gasoline tank and the nature and location of the fuel line were readily apparent. Plaintiff secured a demonstration of the equipment before buying. Plaintiff has a number of employees familiar with various types of mechanized equipment, including a full-time mechanic. It cannot now be heard to assert particularly as against West Florida, an implied warranty against alleged defects in such obvious features of the Bobcat.

* * * * * *
"In resisting the motion for new trial plaintiff stresses the alleged defect in the construction of the fuel system in such manner that if the fuel line is ruptured gasoline can flow from the fuel tank by gravity. This presents a question of whether or not the manufacturer should have designed the Bobcat in contemplation of a fuel line breaking. An interesting comparison is found in litigation involving *148 automobile accidents. It has been held that cars should be designed in contemplation of the dangers to occupants resulting from accidents. But these holdings are based upon statistics which show that in the natural course of human events a substantial number of automobile accidents will take place, and this fact should be anticipated by those manufacturing cars for the use of the public. Just the opposite appears in this case. There is no evidence of any accident or fire resulting from the rupture of a gravity-feed fuel line, and there is direct and undisputed evidence that of some 15,000 Bobcats manufactured and operated under a variety of conditions there has not been a single complaint of a fuel line rupturing.
"While the court cannot say that there is no evidence tending to show that the fire resulting in plaintiff's loss resulted from a breach of implied warranty by Melroe or West Florida, the verdict of the jury on this issue is clearly contrary to the manifest weight of the evidence.
"The fourth count of the complaint is the only other count which went to the jury. It alleges sale of the Bobcat to plaintiff and that defendants, or one of them, knew or should have known `that this Bobcat was faulty or defective or that there existed a fault, weakness, defect or defects in such Bobcat, all of which were unknown to plaintiff and were not discoverable by ordinary use or examination or the exercise of reasonable care by plaintiff * * *' and `both of the defendants negligently and carelessly failed to adequately warn, notify or otherwise inform plaintiff of such fault, weakness or defect * * *'.
"As above stated Melroe advertised the Bobcat as suitable for use in fertilizer plants and West Florida had actual knowledge of plaintiff's intended use of the machine.
"It will be observed that this count does not allege negligence in the manufacture or design of the Bobcat, it is bottomed squarely on the charge of negligent failure to warn of a defect of which defendants had actual or constructive knowledge or of which they should have known and which defect was not known to plaintiff and was not discoverable by ordinary use or examination or the exercise of reasonable care.
"The only evidence of defects is the testimony of Professor Flannigan that the use of a partial gravity feed in the fuel system was a defect and that the construction and location of the fuel line was a defect. Professor Flannigan himself `discovered' these `defects' by a simple visual inspection. The evidence indicates that Professor Flannigan is a highly skilled and trained expert. But it does not require the possession of a master's degree in engineering to observe that when the takeoff of the fuel line is several inches below the top of a fuel tank and the fuel line is ruptured the gasoline above the level of the takeoff will flow by gravity through the ruptured fuel line and escape. Nor does it require a college professor to observe the location of a flexible fuel line with respect to the engine and particularly the moving pulleys and the exhaust manifold. The actual composition of the fuel line is not material. Professor Flannigan does not know exactly what it is. He called it rubber but admits it is not rubber but some synthetic.
"The manifest weight of the evidence discloses that if any defect existed in the design of the Bobcat it was of such a nature that it was readily observable by a purchaser and that, consequently, there was no duty on the manufacturer or seller to warn a purchaser.
"Finally, the court is of the opinion that the evidence taken as a whole is so speculative and conjectural that there is insufficient support for the verdict.
"It is reasonable to conclude that the fire in some way by some manner or means *149 originated from the Bobcat. It may be further surmised that the fire began with the igniting of gasoline flowing from a ruptured feed line. How the gasoline became ignited is a matter of conjecture. The probabilities are that it was either from a spark produced by the exhaust system or a spark produced by a short circuit in the ignition. In view of testimony that the Bobcat often backfired it may be more likely that the fire began from a spark from the exhaust system.
"But how the fuel line became ruptured is a matter of pure hypothesis. If the fuel line ruptured, it was because of the application of quite substantial force. What force? It could have been in any one of several ways. The fuel line could have been forced down against the moving pulleys. By whom? Except for brief periods of repair the Bobcat had been entirely under the control of plaintiff's employees for more than three months. The fuel line could have been damaged by employees of West Florida making repairs. It could have been damaged by employees of plaintiff while blowing dust off the machine. It could have been injured in some other way. The jury was not justified in assuming that the proximate cause of the fire was any fault on the part of Melroe or West Florida.
"The court cannot say that there is a complete absence of evidence to support the plaintiff's claims but does find that the verdict is contrary to the manifest weight of the evidence and that the justice of the case requires a new trial."
The prevailing rule in this jurisdiction with regard to the broad discretion of a trial judge in granting a new trial upon the manifest weight of the evidence has been delineated so many times in opinions of appellate courts that reiterating it would make no contribution to the jurisprudence of this State. We simply observe that the doctrine was reaffirmed in Cloud v. Fallis, 110 So.2d 669 (Fla. 1959), and subsequent cases thereunder. We cannot say that the extensive evidence recited above from the trial judge's order is so inconclusive as to require this Court to upset the broad discretion vested in him.
The judgment appealed is affirmed.
JOHNSON, C.J., and CARROLL, DONALD, K., J., concur.