### JOHN H. PHIPPS BROADCASTING STATIONS, Inc. v. INTERNATIONAL HARVESTER CO., et al.

No. 74-852.

Circuit Court, Leon County.

November 15, 1976.

Brian S. Duffy of Ervin, Varn, Jacobs, Odom & Kitchen, Tallahassee, for the plaintiff.

Michael R. N. McDonnell of Brown, McDonnell & Hart, Tallahassee, for the defendant International Harvester Co.

Frank E. Sheffield, Tallahassee, for the defendant Sheffield Auto & Truck Service, Inc.

BEN C. WILLIS, Circuit Judge.

*Final judgment:* This cause came on for trial and final hearing on October 4 and 5, 1976 before the court, trial by jury having been waived by the parties, and the court having heard and examined the evidence and having heard argument of counsel and examined their briefs and being otherwise advised, it is ordered and adjudged —

1. The court submits the following findings of fact —

A. The plaintiff corporation is the owner of Ayavalla Plantation, a large farm and ranch located in Leon County. John H. Phipps lives on the plantation and, as its general manager, oversees and directs its operations. The plantation is engaged in the cultivation of cattle and various cash crops, including corn and oats, and also harvests timber from the woodlands. The area of the plantation is extensive and because of the diversities of its operations and activities Mr. Phipps had need of a motor vehicle designed and equipped for off-the-road travel. There is considerable rough terrain on the farm where it would be desirable for Mr. Phipps to visit and inspect. Included in the area are certain corn fields which are combined at harvest time, leaving in the field stalks and corn stubble along with other vegetation. In some of the years prior to the events involved in this case, Mr. Phipps had procured for the farm several pick-up trucks manufactured by the defendant, International Harvester Company, through its retail distributor in Tallahassee, Sheffield Auto and Truck Service, Inc. International is a manufacturer of farm equipment and machinery and also farm-type motor vehicles. In 1973 Mr. Phipps decided to purchase a 1974 International Wagonmaster, which he determined was suitable for his purposes in connection with his activities on the plantation. This vehicle is a pick-up truck with four doors, described as a six-man cab. It also had automatic transmission, power steering, air conditioning and four wheel drive.

A tool box had to be modified to fit the new truck. It also was provided with two gas tanks. The primary tank was located in the left rear of the vehicle, and the auxiliary tank was on the right side behind the right front fender. The fuel system consisted of the tanks mentioned, together with fuel lines and valves connecting the gas tanks with the fuel pump, and eventually the carburetor, and the driving mechanism. Nylon tubing extended from the left rear fuel tank to a selector valve located within the well of the front right fender. Rubber tubing connects the auxiliary tank on the right to the selector valve. The tubing from both tanks are connected to the selector valve at its bottom, and a steel tube emerges from the top of the selector valve to carry gasoline along the splash panel in the wheel well to the fuel pump inboard. A polyethylene shield is positioned in front of the selector valve to protect it and its connections from foreign objects being thrown from the front wheel or otherwise into the wheel well. The selector valve is the mechanism employed to designate the tank from which the gasoline is to be drawn. The selector can be operated manually by manipulating an instrument in the instrument panel in the cab.

B. It is not uncommon for weeds, corn stubble and other similar material to become lodged in the wheel wells of the farm vehicles used in off-the-road travel. This would be particularly true in driving across the rows of a harvested corn field in which there remain corn stalks, weeds and the like. Such a use and result is not at all unique and is a common occurrence in the farm operations and other activities on the plantation for which the vehicle was designed to be used.

C. The 1974 truck was manufactured at International's assembly plant in accordance with a line setting ticket which specifies the options which had been selected. It was delivered and the sale consummated on or about October 26, 1973. The total purchase price, including a trade-in of a pick-up truck, was $6,942.82. When received the truck had been driven from the assembly plant to Tallahassee by an employee of Sheffield, a distance of about 800 miles, though the odometer registered only a few miles.

D. The truck was used on the plantation for eight days before it was destroyed by fire as will be presently described. A Mr. Mainor Poppell was employed as a mechanic on the farm with the duties of maintenance, servicing and repair of farm equipment and vehicles. His routine included the checking of the motor vehicles each morning for any evidence of malfunction and to fill the fuel tanks and maintain a proper level of lubricating oil. He checked this vehicle during the eight days and found no leaks, made no adjustments or repairs, and noted nothing amiss.

E. On the day of the loss of the truck a dove shoot was held in a harvested cornfield and some of the Phipps grandchildren were in the dove field. Mr. Phipps and his wife desired to check the shoot and together they rode in the truck to the field and traveled off-road into the stubble area. The vehicle then registered about 125 on the odometer. In the field were stubble and battered down cornstalks but this did not materially impede driving in the area.

F. Mr. Phipps had placed in the truck some items of personal property, including a pair of binoculars of a value of $400. With Mr. Phipps driving they went into the field, stopped to talk with some of the grandchildren, and then drove on. Mrs. Phipps remarked that she smelled smoke, but not sensing that such was connected with the truck Mr. Phips drove on down the field at a speed of less than 10 miles per hour. Presently Mr. Phipps smelled smoke, stopped the truck, and got out to discover a fire in the right front wheel well with the tire and corn stalks in the well strongly ablaze. He was able to remove some of the burning stalks but could not reach all of them. Efforts to drive the truck toward a pond failed. The fuel tank tanks were removed to prevent a gas tank explosion. All the personal property was removed except for the binoculars, which were destroyed. The fire became a danger to the combustible matter in the field, and soon there were attracted a number of hunters in the field who succeeded in stamping out the fire in the field. However, with nothing but sand to use to fight the fire and the blaze being very intense it spread and completely destroyed the truck. Several days later the remains of the burned out truck were hauled to the Sheffield Auto premises.

G. Mr. Phipps did not suspect that the fire was the result of any defect in the vehicle, and promptly sought a replacement of a truck as nearly like the other one as available. A new 1973 model International pick-up was located which had the four wheel drive, dual tanks, and the other special features desired by Mr. Phipps. The purchase price was $6,448 cash. No trade-in was involved. This truck appeared to perform satisfactorily for a few weeks. However, Mr. Poppell observed gasoline leaking from the area of the selector valve, which was, as on the other truck, located at the rear of the right front wheel well. Mr. Poppell attempted to correct this leak by tightening the fixtures at the connections. However, the leak continued to reoccur. He reported this to Mr. Phipps, who became fearful of a repetition of a fire such as destroyed the other truck. Mr. Poppell advised Mr. Phipps that the truck was unsafe. Mr. Phipps deemed that the truck, because of this danger, was not at all feasible for his purposes. He returned the truck to Sheffield's together with the certificate of title and

demanded the return of the purchase price for both vehicles. This was refused.

2. Much testimony was received by those who had special expertise and there was a sharp conflict in conclusions reached as to the suitability and safety of the fuel deliver system, particularly in the vicinity of the selector valve in the right front wheel well. The nylon and rubber tubing are flexible and perhaps are more suitable than would be rigid metal tubing from the tanks to the selector valve. However, the location of the selector valve in the wheel well with its small polyethylene shield and with the nylon and rubber tubing particularly unshielded rendered all of them particularly vulnerable to damage or rupture from stones, sticks and various flammable debris which are likely to be cast into or caught in the wheel well area. Nylon is said to be less resistant to heat than rubber, but both will collapse and disintegrate in temperatures lower than that of an open flame. The court is of the view that the greater weight of the evidence shows circumstances from which it may be reasonably inferred that the fire was initially ignited due to some friction or sparks or other heat source in the vehicle operating upon the flammable corn stalks and other vegetation in the wheel well. The intensity of the fire indicates that it was further fueled by the presence of a highly flammable liquid such as gasoline which must have come from the fuel lines or selector valve. The evidence tends to render negative any other reasonable hypothesis. There is not any evidence of any abuse, accident, or other circumstance which could give any account for the fire. The circumstances also are indicative that the escaped fuel resulted from some damage to the fuel lines or selector valve arising from normal operation of the vehicle in the off-road areas of the farm.

3. The court is further of the view that the arrangement of the fuel lines and the selector valve without more adequate shields and guards in the wheel well base constitutes a defect in the pick-up truck which rendered the truck unfit for the ordinary purposes for which the truck is used. This constitutes a breach of the implied warranty of merchantability under Section 672.314(2)(c), Florida Statutes. It is also contended that there is also a breach of implied warranty of fitness for a particular purpose under Section 672.315, Florida Statutes. It is not shown that Mr. Phipps at any time relied upon the seller or anyone else's judgment or skill to select the trucks he bought. He knew what he wanted and ordered it. However, this does not negative the warranty of merchantability, but the court does not deem that there has been a breach of warranty of fitness for any purpose which would be outside the scope of "the ordinary

purposes for which" the truck, equipped as it was, is expected to be used.

4. The court is further of the view that there is "strict liability" on the part of the defendant, International, pursuant to the principles expressed in American Law Institute Restatement (Second) of Torts, Section 402A, which was approved in West v. Caterpillar Tractor Company, 336 So.2d 80 (Fla. 1976). Such strict liability is stated as follows —

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
> > (a) the seller is engaged in the business of selling such a product, and
> >
> > (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
>
> (2) The rule stated in Subsection (1) applies although
>
> > (a) the seller has exercised all possible care in the preparation and sale of his product, and
> >
> > (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

5. The evidence indicates this principle is fully applicable in this case with regard to the burned truck. The court regards the *West* case, supra, as expressing a rule of law applicable to the claim here, although it was not rendered until 1976. It also is regarded that the rule applies to property damages as well as personal injury or other damage.

6. The right to recover for the second truck is based upon Section 672.608, Florida Statutes, which, among other things gives the buyer of a commercial unit, i.e. "a unit of goods as by commercial usage is a single whole for the purpose of sale," Section 672.105(6), the right to revoke his acceptance of same "whose nonconformity substantially impairs its value to him," provided the buyer accepted it "without discovery of such nonconformity if his acceptance was reasonably induced . . . by the difficulty of discovery before acceptance . . ." The evidence indicates that the second vehicle had the same fuel storage and delivery system as did the destroyed truck. A circumstance which would constitute a breach of warranty of merchantability of the truck would render

it in a state of "nonconformity." See definition of "conforming." Section 672.106(2), Florida Statutes. Also, if the nonconformity was such that it rendered use of the truck a fire hazard such "impairs its value." It also appears that discovery of such nonconformity would not have arisen by a mere inspection of the vehicle or even a close observance of the fuel system features in the wheel well. There was no reason for Mr. Phipps to suspect that this was a potential fire hazard until there was a demonstration of leakage in the selector valve assembly which was not remedied by routine adjustment. It thus appears that the defect was difficult for an ordinary buyer to discover. The defect was a latent one. It is concluded that the greater weight of the evidence has shown facts to support a right of revocation of the acceptance of the truck and entitle the plaintiff to recover for the purchase price of same. The revocation by returning the vehicle, tendering certificate of title and demanding refund of purchase price occurred within a reasonable time after discovery of the defect and before any substantial change in condition of the truck which is not caused by its own defects. See Section 672.608(2), Florida Statutes.

7. The court has considered and is fully familiar with Fletcher Co. v. Melroe Manufacturing Co., 238 So.2d 142 (1st DCA Fla. 1970). The principles announced there are sound, but the facts in the two cases are significantly different. The defects in design of the fuel delivery system in the case now before the court were not obvious or reasonably discoverable by the purchaser. One is not required to guard against danger in places where it is not expected to be. Mathews v. Lawnlight Company, 88 So.2d 299 (Fla. 1956).

8. In view of the foregoing it is concluded that the plaintiff is entitled to recover the purchase price of the destroyed truck. In view of its newness the purchase price is a reasonable measure of fair market value. It is also entitled to recover the value of the binoculars, which is shown to be $400. In revoking the acceptance of the second vehicle the purchase price is entitled to be refunded. Its use for the period before discovery of the defect has not rendered any substantial change in its condition not caused by the defect.

Accordingly, it is further ordered and adjudged that the plaintiff, John H. Phipps Broadcasting Stations, Inc., do have and recover of and from the defendant, International Harvester Company, a corporation, the sum of thirteen thousand, seven hundred ninety dollars and eighty-two cents ($13,790.82) together with costs to be hereafter taxed in a separate proceeding, if the parties do not stipulate to same.